Opinion delivered May 8, 1886.

[No. 4001.]

MOSE LIGHTS *v.* THE STATE.

1. ASSAULT WITH INTENT TO RAPE.—INDICTMENT conforming to No. 358 of Willson's Criminal Forms is sufficient to charge an assault with intent to commit rape.

2. PRACTICE—EVIDENCE—CASE OVERRULED.—For the purpose of discrediting a witness, it is competent to ask him if he has ever been confined in the penitentiary for crime, and he can be required to answer. In so far as it announces the contrary doctrine, the case of The State v. Ivy, 41 Texas, 35, is overruled. See the opinion *in extenso* on the question.

3. SAME.—It is a rule of evidence that, in prosecutions for rape, or assault with intent to rape, "recent complaint of the person injured, her state and appearance, marks of violence, and the condition of her dress shortly after the alleged occurrence, may be proved as original evidence." See the

opinion *in extenso* for evidence *held*, under this rule, to have been properly admitted.

4. SAME—CHARGE OF THE COURT.—It is not required that the charge of the court shall embody the statutory definition of the offense, provided the constituent elements are so charged that the jury are required to find their existence as a prerequisite to conviction. In this case the jury, after being correctly charged as to what would constitute an assault, were instructed that, " where a male person makes an assault on a woman, with intent then and there, by force, to have carnal knowledge of such woman, without the consent, and against the will of the woman, such assault would be an assault with intent to rape." *Held* sufficient to charge the cardinal elements of rape.

APPEAL from the District Court of Brazos. Tried below before the Hon. N. G. Kittrell.

The conviction was for an assault with intent to rape one Virginia Franklin, in Brazos county, Texas, on the fourth day of March, 1886. The penalty imposed by the jury was a term of seven years in the penitentiary.

Mrs. Virginia Franklin was the first witness for the State. She testified, in substance, that in March, 1886, she and her husband lived in Bryan, Brazos county, Texas. While the witness was clearing up the dishes after dinner on the fourth day of that month, after her husband had returned to town from his dinner, the defendant, whom witness did not know was in the room (the kitchen), took hold of her left shoulder. Witness, supposing the person to be one of the children, looked up and saw the defendant. She was too startled to be able to scream. After a considerable struggle, the witness escaped from the clutch of the defendant and fled, followed by the defendant to the door. She continued her flight to the house of her husband's mother, about four blocks away, and reported what had occurred. Witness did not know the defendant, but during the preceding two weeks had seen him pass the house several times. The blood was forced from the witness's wrist in the struggle, and her shoulder was sore for two weeks. Witness had no idea of the proximity of the defendant or other person at the time of the assault. He approached her noiselessly, and as witness looked up when he touched her, he said: "You are a grand woman, but I reckon I will have my way about things a while now." He said nothing else, but tried to hold witness, and pursued her when she fled. He did nothing indecent, but his conduct, as described by witness, could not be called decent. Witness was absolutely posi-

tive that the defendant was the man who assaulted her.   Sheriff
Dawson brought Noona Pillars to witness for inspection on the
day before he brought the defendant, but witness knew at once
that Pillars was not her assailant.   Defendant was taller and
lighter of complexion than Pillars.   Minnie Russell cooked for
witness a few days after the assault, and attempted several
times to get witness to talk about the assault.   Witness refused
to talk to her. She did not tell the said Minnie that the man who
assaulted her was of lighter complexion than Andy Williams;
nor that she was not absolutely certain that defendant was the
man who assaulted her.   Witness may, when Noona Pillars was
brought before her, have said that the man who assaulted her
was taller than Pillars and of about the same color.   Witness
may have expressed a doubt at first about defendant being her
assailant, but she had a reason for so doing.   She was afraid
that if she positively identified the defendant, her husband
would do him violence.

Mrs. Elizabeth Franklin, the mother of Hamilton Franklin,
the husband of the first witness, testified, for the State, that, on
the fourth day of March, 1886, at about three o'clock in the even-
ing, Virginia Franklin came running to her house. She was
much excited and frightened.   After she became somewhat com-
posed she reported that she had been assaulted, and it was dis-
covered that her wrist, at one place where the skin was rubbed
off, was bruised and bleeding.

Sheriff Dawson testified, for the State, that he arrested the de-
fendant on the day after the alleged assault on Mrs. Franklin,
kept him in jail that night, and took him to Mr. Hamilton Frank-
lin's house about 11 o'clock on the next day.   He met Franklin,
his wife, and mother, at the gate.   He asked Mrs. Franklin if
the defendant was the man who assaulted her.   She raised her
veil, and, after a few minutes' inspection, answered unhesita-
tingly and positively that he was.   Mr. Franklin moved as if to
assault defendant, but desisted on being admonished by witness
not to molest his prisoner.   Witness, on the day before, took
Noona Pillars before Mrs. Franklin, and she said at once that he
was not her assailant.   The State closed.

George Harrison, the first witness for the defendant, testified
that defendant came to his shop about ten o'clock on the morn-
ing of the alleged assault on Mrs. Franklin, and remained, play-
ing checkers with the witness, until a few minutes before the
down train arrived, which was at ten minutes before one o'clock.

When he left he went towards J. Lock's store. Franklin lived up the rail road, about a half a mile from Lock's store. Defendant came back to witness's shop at about three o'clock, riding a horse bare back, and tried to borrow a saddle.

Cross-examined, the witness stated that, on leaving his shop, the defendant said he was going to Mr. Lock's store, and that he had Fennell's horse to water. Witness visited his brother once, in the town of Huntsville, but was never in the penitentiary.

Jack Nicholas testified, for the defense, that he was an employe of Mr. Joe Lock, whose mercantile establishment was situated on Main street, in Bryan, about a half a mile distant from Franklin's house. The defendant was at Lock's store when the witness returned with the delivery wagon, at about half past one o'clock on the day of the alleged assault. He remained there until the witness went to meet the north bound passenger train, which passed at twenty minutes past two o'clock, when he got in the wagon, and went with the witness. From the passenger train, the defendant went back to Lock's store with the witness, and was still at Lock's store, eating ginger snaps and bacon, when the witness left the store to deliver goods, at a few minutes after three o'clock. Witness was not related to the defendant, but had known him about six years.

Monte Wilman testified, for the defense, that he was a clerk in the store of Mr. Joe Lock. Defendant was at Mr. Lock's store between one and three o'clock on the day of the alleged assault, and purchased some ginger snaps and bacon. He may have been there between two and three o'clock. Witness did not know when he left Lock's store, nor whether or not he went to the train with Jack Nicholas. Jim Chase was at Lock's store with defendant.

Bailey Bowen testified, for the defense, that he saw the defendant, off and on, during the morning of the alleged assault, about Nunn's saloon. He saw defendant again at about three o'clock, or a little later, crossing from the bank towards the saloon, and going from the direction of Lock's store. Witness heard of the assault on Mrs. Franklin a few minutes before. About that time Camp Jones and Harrison Graves came into the saloon, and Harrison Graves, who was suspected, acting under witness's advice, placed himself in the custody of the sheriff to escape possible violence. Witness told defendant about the assault on Mrs. Franklin, and that Harrison Graves had surrendered. Defendant appeared very much surprised,

and his expression, looks, and manner, convinced witness that he knew nothing about the affair.

Noona Pillars testified, for the defense, that on the day of the alleged assault, he was arrested by Mr. Franklin, and taken to his house for identification. Mrs. Franklin declared that the witness was not the man who assaulted her. She said that her assailant was taller, heavier, lighter of color, and wore a thicker mustache than the witness. Witness was lighter of color than defendant, and wore a mustache. Defendant had never worn a mustache. Minnie Russell and Mr. Franklin's family were present when Mrs. Franklin made the statements recited.

Minnie Russell testified, for the defense, that she was at Mrs. Franklin's house on the day after the alleged assault. While she and Mrs. Franklin were standing in the door of that house, Andy Williams passed, and Mrs. Franklin remarked that he looked like her assailant. Andy Williams was half, and perhaps more than half, white. He was lighter of complexion than Noona Pillars, who in turn was lighter than defendant. Within a short time after Andy Williams passed, the defendant passed on horse back, and Mrs. Franklin said: "He looks something like the man, but I don't want my husband to know it, for he would hurt him, and I am not sure he is the person." Mrs. Franklin did not refuse to discuss the assault with witness.

Deputy sheriff R. H. Smith testified, for the defense, that, between three and four, and perhaps as late as a little past four o'clock, he saw the defendant on the street near Koppa's house, a quarter of a mile or more from Franklin's house. He did not know where the defendant was between three and four o'clock, when the assault was said to have been committed.

Sheriff Dawson testified, for the defense, that Harrison Graves surrendered to him about four o'clock on the day of the assault.

The motion for new trial raised the questions discussed in the opinion.

*J. W. Doremus* filed an able brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge. This is an appeal from a judgment of conviction for assault with intent to rape. A motion made to quash the indictment was properly overruled, it being in all

respects conformable to the approved precedents. (Willson's Criminal Forms, No. 358, p. 162.)

On the trial the district attorney was permitted, over objection of defendant, to ask defendant's witness, George Harrison, "if he had not been in the penitentiary, and if he was not sent up from Navasota, Grimes county?" It is insisted that such questions were inadmissible for any purpose. If to show incompetency, that then the record of conviction was the only legal evidence (Code Crim Proc., Art. 644; Cooper v. The State, 7 Texas Ct. App., 179); if to discredit the witness, then such method was incompetent.

In Ivy v. The State, 41 Texas, 35, where the witnesses were permitted to be asked where they came from and to answer that they came from jail, the court say: "If the object was to impeach the credit of the witnesses, before the jury, it was not competent for that purpose, and they could not be discredited in that mode. However that may have been, the question having been asked and answered, the witnesses should have been permitted to state on what charge and under what circumstances they were committed, so that the jury might judge of the circumstances, in considering and weighing their evidence."

Mr. Wharton says: "In a leading case, Lord Ellenborough, chief justice, compelled a witness to answer whether he had not been confined for theft in jail, and on the witness's appealing to the court, said: ' If you do not answer I will send you there.' In this country there has been some hesitation in permitting a question, the answer to which not merely imputes disgrace, but touches on matter of record; but the tendency now is, if the question be given for the purpose of honestly discrediting a witness, to require an answer." (Whart. Cr. Ev., 8 ed., 474, and numerous authorities cited.)

In Real v. The People, 42 New York, 270, it was said by Grover, judge: "My conclusion is that a witness, upon cross-examination, may be asked whether he has been in jail, the penitentiary, or state prison, or any other place that would tend to impair his credibility; and how much of his life he has passed away in such places. When the inquiry is confined as to whether he has been convicted, and of what, a different rule may perhaps apply. This involves questions as to the jurisdiction and proceedings of a court, of which the witness may not be competent to speak. This was the point involved in Griswold v. Newcomb, 24 New York, 298, and the only point in that

case. Here the inquiry was simply whether, and how long, the witness had been in the penitentiary. This the witness knew, and could not be mistaken about.     *     *     *. ˙   The extent of the cross-examination of this character is some what in the discretion of the court, and must necessarily be so, to prevent abuse."

In the State v. Pike, 65 Maine, 111, it was held that a witness, having testified on cross-examination that he had been in prison, could be asked what this was for. Ordinarily, convictions must be proved by record.

Under these authorities, we think it clear that the ruling, as quoted in Ivy v. The State, *supra*, is incorrect, and the doctrine as there announced upon this subject, will hereafter be considered as overruled. The court did not err in permitting the questions to be asked.

It was not error, as complained of in appellant's fourth bill of exceptions, to permit Mrs. Elizabeth Franklin to testify to the statements made by Virginia Franklin, the prosecutrix, with regard to what had transpired, and as to her nervous condition, and the swollen appearance of, and blood upon, her, wrist. These statements of the prosecutrix, and her appearance and condition, were heard and seen by the witness in a very few moments after the occurrence, and were *res gestœ*. It is always permissible in such cases to show that the prosecutrix did, within a reasonable time, and upon the first opportunity, discover and make known the offense which had been perpetrated upon her. It has, therefore, been universally held, "that recent complaint by the person injured, her state and appearance, marks of violence, and the condition of her dress, shortly after the alleged occurence, may be proved as original evidence." (Pefferling v. The State, 40 Texas, 486.)

Several objections by the appellant's counsel are levelled at the charge of the court. It is claimed that the court neither defined nor informed the jury as to the constituent elements of rape. It has never been held that the statutory definition of an offense is essentially requisite in the charge, provided the constituent elements are so charged as that the jury are required to find their existence as a prerequisite to conviction. In this case the jury were charged, after having been previously instructed as to what constituted an assault, that, "where a male person makes an assault on a woman, with intent then and there, by force, to have carnal knowledge of such woman, without the consent and

against the will of the woman, such assault would be an assault with intent to rape." This sufficiently instructed them in the cardinal elements of rape. (Penal Code, Art. 528.)

In so far as the other objections to the charge which are specially pointed out in the bills of exceptions and brief of counsel for appellant are concerned, we do not consider them well taken. We have found no reversible error presented in the record before us, and the judgment is therefore affirmed.

*Affirmed.*